IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Mark Howell and the other Plaintiffs listed on Exhibit A, attached hereto, | § § § § | CIVIL ACTION NO. _____ |
| *Plaintiffs*, | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| GENERAL MOTORS, LLC, | § § | |
| *Defendant*. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW the individuals listed on the attached and fully incorporated Exhibit "A" (hereinafter the "Named Plaintiffs"), through the undersigned counsel, who respectfully show as follows:

## I.
## PRELIMINARY STATEMENT

1.  The Named Plaintiffs' causes of action are brought solely against GENERAL MOTORS, LLC ("New GM"). Named Plaintiffs do not assert any causes of action against General Motors Corporation ("Old GM").

2.  Any references to General Motors Corporation, Old GM, or pre-sale order conduct in this Complaint are for background and reference purposes only. Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement ("Purchase Agreement"), New GM acquired certain Old GM assets and product liabilities, including product liability for crashes involving Old GM vehicles causing personal injury, loss of life, or property damage. New GM also acquired knowledge of Old GM's activities and the defective ignition switch, as well as other

serious defects identified herein, via the mind of the employees, officers, managers, books, and records obtained and/or acquired as a result of the Purchase Agreement and subsequent Sale Order, as further defined by the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).  Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM.  Further, as identified therein, the Plaintiffs have claims for crashes involving Old and/or New GM vehicles ("GM vehicles") that caused personal injury, loss of life, or property damage and New GM is, therefore, liable to the Named Plaintiffs.

## II.
## INTRODUCTION

3.      At any given moment, an ignition switch in a variety of Old and New GM vehicles could fail, killing or maiming the driver, passengers, other motorists, or innocent bystanders.  Such disastrous system failures in Old and New GM vehicles are triggered by something as simple as a key chain attached to the vehicle's key or a bump in the road, which can cause the vehicles ignition switch to change from the "run" position into the "accessory/off" position, with a corresponding reduction or loss of power.  (*See* Mar. 11, 2014 Ltr. from New GM to Nancy Lewis re: National Highway Transportation Safety Administration ("NHTSA") Recall No. 14V-047 ("Lewis Letter") at 1 ("Until the recall repairs have been performed, it is very important that customers remove all items from their key rings, leaving only the vehicle key."); *see also* New GM Safety Recall Notice ("Th[e] risk increases if your key ring is carrying added weight (such as more keys or the key fob) or your vehicle experiences rough road conditions or other jarring impact related events.").)  Yet, New GM also admits to its customers that lightening the key chain may not help as "rough road conditions or other jarring impact related events" could cause the vehicle to experience full loss of

power, steering, braking, and air bag deployment.  (*See* Mar. 24, 2014 Ltr. from Senator Blumenthal to Attorney General Holder.)  Appropriately, the Old GM engineer who designed the ignition switch called it "the switch from hell."  (*Rpt. to the Bd. of Directors of General Motors Co. Re: Ignition Switch Recalls*, authored by Anton R. Valukas of Jenner & Block (May 29, 2014) (the "Valukas Report") at 5.)

4.  New GM's refusal to communicate honestly about the defective ignition switch had gone on at least four and a half years—since Old GM filed for bankruptcy.  Throughout that time, New GM knew of the life-threatening danger, and yet concealed the risk from drivers.  Considering both the time that Old GM discovered the ignition switch defect and the time that New GM learned about it, 13 years have passed.  New GM belatedly admits that there was a death for every year of their collective silence.  But, a recent report suggests that the death toll is exponentially higher than New GM admits, with the number actually in the hundreds.  (*See* Mar. 13, 2014 Ltr. from Ctr. for Auto Safety to Hon. David J. Friedman ("On March 7, the Center for Auto Safety (CAS) wrote you about NHTSA's failure to utilize its Special Crash Investigations (SCI) of 2005 Cobalts and 2004 Ions and Early Warning Reports (EWR) of death claims filed by GM to open a defect investigation and order a recall.  Examination of NHTSA's Fatal Analysis Reporting System (FARS) reveals 303 deaths of front seat occupants in the recalled 2005-07 Cobalts and 2003-07 Ions where the airbag failed to deploy in non-rear impact crashes.").)  This new figure is drawn from data on only two of the six recalled models, the Chevrolet Cobalt and Saturn Ion.  The death toll is expected to increase significantly as the full gamut of defective vehicles and incidents comes to light.

5.  Old GM remained silent in 2001 when it received evidence that there was a problem with the now-recalled ignition switch in a pre-production Saturn Ion.

6.     Old GM remained silent in 2004, when two Old GM engineers reported that the Ion's ignition switch could accidentally turn off if inadvertently hit by the driver's knee.  (*See* Lewis Ltr.; *see also* GM Recall Timeline.)  At that time, Old GM's engineers reportedly considered several remedies to increase the torque in the key cylinder, but no action was taken "after consideration of the lead time required, cost and effectiveness of each of these solutions."  (Lewis Ltr.)  Old GM remained silent throughout 2005, when it received numerous reports of its customers' vehicles stalling, including a fatal crash in which a Cobalt's airbags did not deploy.  A proposal to redesign the ignition key was approved by Old GM, then cancelled for undisclosed reasons.  Old GM sent its dealers a bulletin instructing them to tell customers who complained of stalling to remove extra items from their key chains.  Old GM also developed a key insert to prevent the key ring from hanging so low, but warranty records show that only 474 customers received one, compared to more than one million vehicles sold.

7.     Old GM remained silent in 2006, when more than 30 complaints had been filed with the NHTSA about unexpected stopping and stalling—at least a dozen of these complaints involved the 2005 Chevrolet Cobalt.

8.     Old GM remained silent in 2007, when it began tracking frontal-impact Cobalt crashes with no airbag deployment and discovered that, in four of ten of such incidents, the ignition was in "accessory" mode.  Old GM also remained silent about the defects when it elected to discontinue the Ion that same year, and when over 80 complaints about unexpected stopping or stalling were filed with the NHTSA, including at least 30 involving the now-recalled 2005 Chevrolet Cobalt.

9.    Old GM remained silent in 2008, when the NHTSA received 90 complaints about unexpected stopping or stalling for the now-recalled vehicles, including at least eight involving the 2006 Chevrolet HHR.

10.    Old GM remained silent in 2009, as the NHTSA complaint toll reached 120, including at least one 2007 Chevrolet Cobalt.

11.    New GM remained silent in 2009, when Old GM employees, officers, and managers with knowledge of the issue came to work for New GM.

12.    New GM continued its silence in 2009, when it acquired Old GM's books and records pursuant to the Purchase Agreement and subsequent Sale Order, which books and records referenced and detailed the defective ignition switch.

13.    New GM remained silent in 2010, as the NHTSA complaint toll reached 170, including at least 35 complaints involving the 2006 Chevrolet Cobalt.

14.    New GM remained silent in 2013, when a technical expert discovered that the ignition switches in Ions and early-model Cobalts did not meet GM's torque specifications. Records reveal that Delphi Mechatronics provided Old GM with documents uncovering the 2006 ignition design change.

15.    GM's silence over these 13 years speaks volumes.  It demonstrates an egregious and unprecedented failure to disclose a known defect, not to mention a complete and utter disregard for human life.

16.    In addition or alternative to the above-described and well-publicized ignition switch defects, the Named Plaintiffs' GM vehicles, identified on Exhibit A, have suffered from one or more other serious and (at least potentially) life-threatening defects, which have been the subject numerous recalls, as further described herein at ¶¶ 20, 99-121.

**III.**

**PARTIES**

17.    The Named Plaintiffs are those individuals listed on the attached Exhibit A, which is incorporated as if repeated in full herein.  Plaintiff Mark Howell is, and was at all times relevant hereto, a resident of Nevada.  Plaintiff Isaiah Jernigan is, and was at all times relevant hereto, a resident of Florida.  Plaintiff Eric Wyatt is, and was at all time relevant hereto, a resident of Pennsylvania.

18.    The Plaintiffs assert claims against Defendant General Motors LLC ("New GM") for personal injury and/or wrongful death stemming from injurious or deadly crashes involving GM vehicles.

19.    The Named Plaintiffs' personal injury and/or wrongful death claims involve one or more of the following GM vehicles: (a) the First Wave Defective Vehicles, consisting of Chevrolet Cobalt (2005-2010 model years); Chevrolet HHR (2006-2011 model years); Pontiac GS (2006-2007 model years); Pontiac Solstice (2006-2010 model years); Saturn Ions (2003-2007 model years); Saturn Sky (2007-2010 model years); and (b) the Second Wave Defective Vehicles, consisting of Buick LaCrosse (2005-2009 model years); Buick Lucerne (2006-2011 model years); Buick Regal LS (2004-2005 model years); Buick Regal GS (2004-2005 model years); Cadillac Deville (2000-2005 model years); Cadillac DTS (2004-2011 model years); Cadillac CTS (2003-2014 model years); Cadillac SRX (2004-2006 model years); Chevrolet Camaro (2010-2014 model years); Chevrolet Impala (2000-2014 model years); Chevrolet Monte Carlo (2000-2008 model years); Chevrolet Malibu (1997-2005 model years); Oldsmobile Intrigue (1998-2002 model years); Oldsmobile Alero (1999-2004 model years); Pontiac Grand Am (1999-2005 model years); Pontiac Grand Prix (2004-2008 model years); Daewoo G2x (2007-2009 model years); Opal GT (2007-2010 model years); Pontiac Pursuit (2005-2007 model years); and Vauxhall GT (2007-2010

model years). The First Wave Defective Vehicles and the Second Wave Defective Vehicles are collectively the "Defective Vehicles."

20.    Additionally, or in the alternative, the Named Plaintiffs' personal injury and/or wrongful death claims involve one or more of the following GM vehicles and defects, which are also included in the definition of "Defective Vehicles" herein:

| | |
|---|---|
| 2005-07 Chevrolet Cobalt; 2006-07 Pontiac Pursuit; 2003-07 Saturn ION; 2006-07 Chevrolet HHR and Pontiac Solstice; 2007 Saturn Sky, Opel/Vauxhall GT, Daewoo G2X and Pontiac G5 | Ignition switch torque performance defect |
| 2009-14 Chevrolet Express and GMC Savana | Front passenger airbag performance (NC) defect |
| 2008-13 Buick Enclave, Chevrolet Traverse, GMC Acadia, Saturn Outlook | Side impact airbag connector defect |
| 2008-11 Chevrolet HHR; 2008-10 Chevrolet Cobalt; 2008-10 Pontiac G5; 2008-10 Pontiac Solstice; 2008-10 Saturn Sky; 2008-10 Opel GT; 2008-09 Daewoo G2X | Ignition switch torque performance defect |
| 2004-06 Chevrolet Malibu/Malibu Maxx, Pontiac G6; 2004-07 Saturn ION; 2008-09 Chevrolet Malibu, Pontiac G6, Saturn Aura; 2010 Cobalt; 2009-10 Chevrolet HHR; Previous EPS Recall Service Parts | Electronic Power Steering defect |
| 2005-10 Chevrolet Cobalt; 2006-11 Chevrolet HHR; 2006-10 Pontiac Solstice; 2003-07 Saturn ION; 2007-10 Saturn Sky and Pontiac G5 | Ignition cylinder defect |
| 2013-2015 Cadillac Escalade | Passenger air bag (NC) defect |
| 2010-14 Chevrolet Camaro | Key FOB can bump ignition defect |
| 2005-09 Buick Allure and LaCrosse; 2006-14 Chevrolet Impala; 2000-05 Cadillac Deville; 2004-11 Cadillac DTS; 2006-11 Buick Lucerne; 2006-07 Chevrolet Monte Carlo | Key replacement from slot to hole defect |

| | |
|---|---|
| 2014 Chevrolet Corvette with Competition Sport Seats | Air bags defect |
| 2013-14 Chevrolet Cruze | Driver air bag defect |
| 1997-2005 Chevrolet Malibu; 1998-2002 Oldsmobile Intrigue; 1999-2004 Oldsmobile Alero; 1999-2005 Pontiac Grand Am; 2000-05 Chevrolet Impala and Monte Carlo; 2004-08 Pontiac Grand Prix | Unintended ignition key rotation defect |
| 2003-14 Cadillac CTS; 2004-06 Cadillac SRX (2014 models are derivative models in previous generation body style; 2014 CTS sedan not involved) | Unintended ignition key rotation defect |
| 2014 Chevrolet Impala | Electronic power steering defect |
| 2007 Chevrolet Optra (Canada); 2009-10 Chevrolet Aveo; 2009 Pontiac G3/Wave | Reduced brake performance defect |
| 2002-04 Saturn Vue | Ignition key pullout in run position defect |
| 2008-09 Pontiac G8; 2011-13 Chevrolet Caprice | Unintended ignition key rotation defect |
| 2007-10 Saturn Aura; 2008-10 Chevrolet Malibu and Pontiac G6 | Transmission shift cable detachment defect |
| 2004-12 Chevrolet Malibu; 2004-07 Chevrolet Malibu Maxx; 2005-10 Pontiac G6; 2007-10 Saturn Aura | Electronic stability control, Service Brakes, Hydraulic, Vehicle Speed Control, Electrical System and Wiring Defects |
| 2011-2012 Cadillac Escalade, Escalade ESV, Escalade EXT, Chevrolet Avalanche, Silverado HD, Silverado LD, Suburban, Tahoe, GMC Sierra LD, Sierra HD, Yukon, and Yukon XL | Ignition Binding |
| 2014 Chevrolet Silverado and GMC Sierra and 2015 Chevrolet GMC Sierra | Steering Rack |
| 2007-2010 Saturn Aura, 2008-2010 Chevy Malibu and Pontiac G6 | Power Train, Automatic Transmission, Gear Position Indication |
| 2005 Chevy Tahoe | Frontal Air Bags |

21.     Defendant General Motors, LLC ("New GM") is a Delaware limited liability company.  On July 10, 2009, New GM acquired substantially all of the assets and assumed product liabilities of General Motors Corporation ("Old GM") by way of a Section 363 sale under Chapter 11 of the Bankruptcy Code.   New GM assumed product liabilities of Old GM, which filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on June 1, 2009.  Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors.  New GM also acquired Old GM's designs, tools, inventory, books, records, and its key contracts, among other essential assets.  Plaintiffs' causes of action in this lawsuit are brought against New GM, and Plaintiffs do not assert any causes of action against Old GM.

22.     Under the Purchase Agreement, New GM assumed liability for crashes after the closing date of the Purchase Agreement involving Old GM vehicles causing personal injury, loss of life, or property damages.

23.     New GM also assumed product liabilities of Old GM, including certain statutory requirements:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

24.     In addition, New GM set forth that:

> From and after the Closing, Purchaser [New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including

service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

25.    At all times relevant to the claims in this lawsuit, Old GM and New GM were in the business of developing, manufacturing, and marketing cars throughout the United States generally, and specifically in each of Plaintiffs' state of citizenship as identified in Exhibit A.  New GM has a network of authorized retailers that sell its vehicles and parts throughout the United States.  New GM maintains its principal place of business at 300 Renaissance Center, Detroit, Michigan.

# IV.
## JURISDICTION

26.    This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and the Plaintiffs and New GM are citizens of different states.

# V.
## FACTUAL BACKGROUND

**A.    General Background**

27.    An automaker should never place profits above safety and should never conceal from consumers or the public any defects that exist in its vehicles.  New GM's Vehicle Safety Chief, Jeff Boyer, recently proclaimed that "Nothing is more important than the safety of our customers in the vehicles they drive."  *GM Announces New Vehicle Safety Chief*, *available at* http://democrats.energycommerce.house.gov/sites/default/files/documents/Testimony-Barra-GM-Ignition-Switch-Recall-2014-4-1.pdf.

28.    Indeed, the first priority of a car manufacturer should be to ensure that its vehicles are safe and, in particular, have safe, operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily

harm in a collision.  In addition, a car manufacturer must take all reasonable steps to ensure that once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, steering, and airbag systems) work properly until such time as the driver shuts down the vehicle.  Moreover, a manufacturer that is aware of a dangerous design defect that causes its vehicle to shut down during operation, its power steering to revert to manual steering, its airbags not to deploy, or other potentially catastrophic system failure, must promptly disclose and remedy such defects.

29.    To date, Old GM and New GM have sold at least 15 million automobiles installed with defective ignition switches which slip into the "accessory" or "off" position and turn off the engine and the car's vital engine systems without warning while the car is in motion.  This ignition switch defect disables the power steering and power brakes and prevents the deployment of air bags in the vehicles.

30.    In addition, or in the alternative, Old GM and New GM have sold approximately millions of vehicles suffering from the other, similar, potentially life-threatening major defects identified in ¶¶ 20, 99-121 herein.  As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**B.    Old GM's Knowledge of Safety-Related Defects and Its Concealment of Those Defects**

31.    It has now come to light that the GM vehicles at issue had safety-related design defects that were known by Old GM as early as 2001, and by New GM as a result of the acquired knowledge from employees, officers, and managers and the books and records that New GM

obtained and/or acquired from Old GM, as described above. During pre-production development of the Ion in 2001, Old GM became aware of issues relating to the ignition switch "passlock" system. Old GM's 2001 internal report stated the problem included a "low detent plunger force" in the ignition switch. In 2003, before launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run" position when the driver inadvertently made contact with the key or steering column. An investigation of these issues was opened and, after consideration of the lead-time required and the cost effectiveness of potential solutions, the investigation was closed with no action taken.

32.     The design of the ignition switch, position of the key lock module, and slot design of the key are hereinafter referred to as the "Key System."

33.     In 2002, Old GM began manufacturing and selling 2003 Saturn Ions with the defective Key System. It later began selling Chevrolet Cobalts with the same defective Key System.

34.     In 2004, Old GM engineers reported that the ignition switch on the Saturn Ion was so weak and so low on the steering column that a driver's knee could easily bump the key and turn off the vehicle. This defect was sufficiently serious for an Old GM engineer, in January 2004, as part of Old GM's vehicle evaluation program, to affirmatively conclude, in writing, that "[t]his is a basic design flaw and should be corrected if we want repeat sales."

35.     In 2004, Old GM began manufacturing and selling the 2005 Chevrolet Cobalt. The Cobalt was a sister vehicle (essentially the same car with different badge or name) of the Saturn Ion. As noted, Old GM installed the same Key System on the 2005 Cobalt as it did on the Saturn Ion.

36.     On October 29, 2004, around the time of Old GM's market launch of the 2005 Cobalt, Gary Altman—Old GM's program-engineering manager for the Cobalt—test drove the Cobalt with the standard key and key fob.  During the test drive, when Altman's knee bumped the key, the engine turned off, causing the engine to stall.  Altman reported the incident to GM.

37.     In response to Altman's report, Old GM launched an engineering inquiry to investigate the potential for the key to move from the "run" to the "accessory/off" position during ordinary driving conditions.  This inquiry is known within GM as a Problem Resolution Tracking System Inquiry ("PRTS").  The specific complaint which resulted in the PRTS was that the vehicle "can be keyed off with knee while driving."

38.     On February 1, 2005, as part of the PRTS, Old GM engineers concluded:

> There are two main reasons that [sic] we believe can cause a lower effort in turning the key: 1. A low torque detent in the ignition switch.  2. A low position of the lock module in the column.

(PRTS – Complete Report N172404).  As part of the PRTS, Old GM engineers also began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

39.     On February 18, 2005, Old GM engineers presented several possible solutions to the Cockpit Program Integration Team ("CPIT").  Old GM engineers determined the only "sure solution" to resolve the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver.  According to Old GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, would be a "sure solution."  Old GM, however,

through Altman, rejected this "sure solution," in part, because the cost to implement the solution would be too high.

40.     During this PRTS, Old GM also considered changing the key from a slot to a hole as a way to attempt to contain this problem, but not as a solution to the problem.  Changing the key from a slot to a hole would reduce the lever arm of the key and the key chain.  With the slot design, the key chain would hang lower on the key which would increase the torque force on the ignition switch when the chain was contacted or moved in any way.  Old GM engineers determined this key change would significantly reduce the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary driving maneuvers.

41.     An Old GM engineer conducted a cost analysis of this key change and determined that the cost to make this change would be less than one dollar per vehicle or around 57 cents per part.  Old GM, however, rejected this proposed key change and, on March 9, 2005, Old GM closed the PRTS without taking any steps to fix the defective Key System in Ions and Cobalts.  The PRTS detailed the reasons why Old GM took no action.

> Per GMX001 PEM's [Gary Altman's] directive we are closing this PRTS with no action.  The main reasons are as follows:  All possible solutions were presented to CPIT and VAPTR: a.  The lead-time for all the solutions is too long.  b.  The tolling cost and piece price are too high.  c.  None of the solutions seem to fully countermeasure the possibility of the key being turned (ignition turn off) during driving.  Thus **none of the solutions represents an acceptable business case** (emphasis added).

42.     On February 28, 2005, Old GM issued a bulletin to its dealers regarding engine-stalling incidents in 2005 Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac G5).  The February 28, 2005 bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  In the February

28, 2005 bulletin, Old GM provided the following recommendations/instructions to its dealers —

**but not to the Named Plaintiffs or to the public in general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort.  The concern is more likely to occur if the driver is short and has a large heavy key chain.

> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning.  The steering column was adjusted all the way down.  This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.

> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.

> Please follow this diagnosis process thoroughly and complete each step.  If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

43.    At that time, however, Old GM knew that the inadvertent turning off of the ignition in the vehicles was due to design defects in the Key System in those vehicles, including the Saturn Ion, and **was not** limited to short drivers using large heavy key chains.  Simply stated, as of February 2005, Old GM engineers knew that the Saturn Ion and Chevrolet Cobalt vehicles had the Key System safety-related defects discussed in this Complaint.  GM failed to disclose and, in fact, concealed, the February 28, 2005 bulletin — and/or the information contained therein, from Saturn Ion and Chevrolet Cobalt owners, including the Named Plaintiffs, and sent affirmative representations to dealers that did not accurately describe the nature of the problem, the multiple design steps needed for a "sure solution" to the problem, and GM's knowledge of it.

44.    Indeed, rather than disclosing this serious safety problem that uniformly affected all Saturn Ion cars, GM, instead, concealed and obscured the problems, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its

own dealers only an incomplete, incorrect, and insufficient description of the defects and the steps necessary to actually remedy them.

45.    Under 49 C.F.R. § 573.6, GM was required to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety."  Instead of complying with its legal obligations, GM fraudulently concealed the Key System defect from the public — including Named Plaintiffs — and continued to manufacture and sell Ions and Cobalts with these known safety defects, causing the Named Plaintiffs to continue to own, operate or ride in vehicles that contained defective and dangerous ignition switches.

46.    In March 2005, following its receipt of a customer complaint that his/her Cobalt vehicle ignition turned off while driving, Old GM opened another PRTS — Complete Report (0793/2005-US).  Steve Oakley, the brand quality manager for the Cobalt, originated the PRTS. As part of the PRTS, Mr. Oakley reviewed an email dated March 9, 2005 from Jack Weber, an Old GM engineer.  The subject of the email was "Cobalt SS Ignition Turn Off."  In the email, Mr. Weber stated:

> I've had a chance to drive a Cobalt SS and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise, the first time I turned off the ignition switch was during a normal traffic brake application on I96.  After that I was able to do a static reproduction of the condition in a parking lot.  I've attached photos of the condition with comments.  My Anthropometric Measurements are attached below:
> Static view of keys, fob and registration hitting knee.
> Position of RKE fob during normal driving.  Dynamic evaluation.
> View of steering column cover and Pass Key 3+ "lump" under the key slot.
> Key in run position, knee contacting the fob and the split ring is pulling on the key to move it to the "off" position.  Static evaluation.
> Fob has levered around the steering column cover and turned the ignition off.
> Unobstructed view of the fob and column cover.
> Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.
> Please call at (586) 986-0622 with questions.
> Jack Weber

16

Mr. Weber clearly identified the defects in the Key System while he was driving the Cobalt, which is essentially the same vehicle as the Saturn Ion.

47.    Despite the clear evidence of the safety-related defect with the Key System, during the March 2005 PRTS, Old GM engineers decided not to reconsider any of the proposed solutions discussed during the February 2005 PRTS.  Instead, the Old GM engineers leading the PRTS recommended that the sole corrective action GM should recommend would be to advise customers to remove excess material from the key rings.  This recommendation was made despite the fact that Old GM knew that the inadvertent turning off of the ignition in these vehicles was due to design defects in the Key System, and was not limited to drivers having excess key materials.

48.    In May 2005, Old GM, following its receipt of another customer complaint that the customer's Cobalt ignition turned off while driving, opened another PRTS.  During the May 2005 PRTS, Old GM decided to redesign the key in order to reduce the possibility that a driver may inadvertently turn the key from the "run" to the "accessory/off" position during ordinary driving.

49.    Despite this initial safety/redesign commitment, however, Old GM ultimately failed to follow through on its own decision and closed this PRTS without any action, further concealing what it knew from the public and continuing to subject the public, including the Named Plaintiffs, to the Defective Vehicles' serious safety risks.

50.    At or about this same time, Old GM, through Alan Adler, Old GM's Manager, Production Safety Communications, issued the following statement with respect to the Chevrolet Cobalt's inadvertent shut-off problems, affirmatively representing in its "Statement on Chevrolet Cobalt Inadvertent Shut-offs" that:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.

When this happens, the Cobalt is still controllable.  The engine can be restarted after shifting to neutral.

GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement.  Depending on these factors, a driver can unintentionally turn the vehicle off.

Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential materials from their key rings.

Ignition systems are designed to have "on" and "off'"positions, and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

51.     Old GM's statement, however, was demonstrably false and misleading.  Old GM's internal testing documents showed that these incidents occurred when drivers were using keys with the standard key fob.  Old GM knew that these incidents were not caused by heavy key chains or a driver's size and seating position.  Old GM also knew that removing the non-essential material from key rings would not "virtually eliminate" the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car was running.

52.     Old GM's above-referenced statement was further demonstrably false and misleading because Old GM knew that these incidents were ultimately caused by the safety-related defects in the Key System identified in the February 2005 PRTS.  Old GM's affirmative concealment of the problems with the defective vehicles, including the Saturn Ion and Cobalt cars, did not end there.

53.     On July 29, 2005, Amber Marie Rose ("Amber"), a sixteen-year-old Clinton, Maryland resident, was driving a 2005 Cobalt when she drove off the road and struck a tree head-on.  Amber's driver's side frontal airbag did not deploy and she died as a result of the injuries sustained in the crash.

54.    Old GM received notice of Amber's incident in September 2005 and shortly thereafter opened an internal investigation file concerning the incident.  During its investigation of the incident, Old GM learned that the key in Amber's Cobalt was in the "accessory/off" position at the time of the crash.  During its investigation, Old GM also knew that the driver's side frontal airbag should have deployed given the circumstances of Amber's crash.  Upon information and belief, Old GM subsequently entered into a confidential settlement agreement with Amber's mother.

55.    In December 2005, shortly after it commenced its internal investigation into the incident leading to Amber's death, Old GM issued a Technical Service Bulletin (05-02-35-007) (the "TSB").  The TSB, which GM affirmatively represented applied to 2005-2006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions, provided, "Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs," provided the following service information:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effort.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain.  In these cases, this condition was documented and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down.  This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause.  The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design.  As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole.  In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design.  This will result in the keys not hanging as low as in the past.

56.    As with its prior statements regarding the Defective Vehicles, the information Old GM provided in this TSB was also false and misleading.  In the two PRTSs Old GM issued before it issued the TSB, Old GM engineers never represented that short drivers or heavy key chains were the reasons why these incidents were happening.  Indeed, at the time it issued the TSB, Old GM knew that these incidents were happening to drivers of all sizes using keys with the standard key fobs.  In other words, Old GM knew these incidents were not caused by short drivers with heavy key chains, but were caused by the safety-related defects in the Key System of its Defective Vehicles, including the Chevrolet Cobalt.

57.    Not only did Old GM fail to address the safety defects, it covered-up and fraudulently concealed the facts from the Named Plaintiffs and the driving public.  One Old GM Quality Service Manager, who drafted a TSB in connection with the ignition switch defects, stated "the term 'stall' is a hot word that Old GM generally does not use in bulletins because it may raise a concern about vehicle safety, which suggests Old GM should recall the vehicle, not issue a bulletin."  Valukas Report at 92.  Old GM personnel stated that "there was concern about the use of 'stall' in a TSB because such language might draw the attention of NHTSA."  *Id.* at 93.

58.    Old GM's widespread cover-up and deception was brought to light in the Valukas Report.  Multiple Old GM employees confirmed that Old GM intentionally avoids using the word "stall" "because such language might draw the attention of NHTSA" and "may raise a concern about safety, which suggests Old GM should recall the vehicle . . . ."  Even New GM's CEO, Mary Barra, testified on June 18, 2014, before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigation, that "we consider a stall to be a safety issue."

59.     In 2005, Old GM began buying back Cobalts from certain customers who were experiencing engine stalling incidents. Old GM never told the public, including the Named Plaintiffs, that it was buying back Cobalts under these circumstances. Old GM refused to buy back Cobalts from other customers who had also experienced engine-stalling incidents. In fact, for many of the customers who complained about experiencing engine-stalling incidents, Old GM never informed these customers of the TSB and/or the availability of the key insert.

60.     On November 17, 2005, shortly after Amber's death and immediately before Old GM's issuance of the TSB, there was another incident involving a 2005 Cobalt in Baldwin, Louisiana. In that incident, the Cobalt went off the road and hit a tree. The frontal airbags did not deploy. Old GM received notice of this crash, opened a file, and referred to it as the "Colbert" incident.

61.     On February 10, 2006, in Lanexa, Virginia, shortly after Old GM issued the TSB, a 2005 Cobalt drove off the road and hit a light pole. As with the Colbert incident (above), the frontal airbags failed to deploy. The download of the SDM (the vehicle's "black box") showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this crash, opened a file, and referred to it as the "Carroll" incident.

62.     On March 14, 2006, in Frederick, Maryland, a 2005 Cobalt traveled off the road and struck a utility pole. The frontal airbags did not deploy. The download of the SDM showed the key was in the "accessory/off" position at the time of the crash. Old GM received notice of this incident, opened a file, and referred to it as the "Oakley" incident.

63.     On August 1, 2006, following its receipt of a customer complaint about a Cobalt stalling while driving, Old GM opened yet another PRTS relating to this issue. Old GM closed this PRTS on October 2, 2006 without taking any action.

64.     In October 2006, Old GM updated the TSB (05-02-35-007) to include additional model years: the 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Cobalt and 2007 Pontiac Solstice and Pontiac 05 vehicles.  These vehicles had the same safety-related defects in the Key System as the vehicles in the original TSB.

65.     On December 29, 2006, in Sellenville, Pennsylvania, a 2005 Cobalt drove off the road and hit a tree.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Frei" incident.

66.     On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Cobalt sailed off the road and struck a truck. Despite there being a frontal impact in this incident, the frontal airbags failed to deploy. The download of the SDM showed the key was in the "accessory/off" position. Old GM received notice of this incident, opened a file, and referred to it as the "White" incident.

67.     On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Cobalt rear-ended a truck. The frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "McCormick" incident.

68.     On September 25, 2007, in New Orleans, Louisiana, a 2007 Chevrolet Cobalt lost control and struck a guardrail.  Despite there being a frontal impact in this incident, the frontal airbags failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the "Gathe" incident.

69.     On October 16, 2007, in Lyndhurst, Ohio, a 2005 Chevrolet Cobalt traveled off the road and hit a tree.  The frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred to it as the "Breen" incident.

70.     On April 5, 2008, in Sommerville, Tennessee, a 2006 Chevrolet Cobalt traveled off the road and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags

failed to deploy.  The download of the SDM showed the key was in the "accessory/off" position.
Old GM received notice of this incident, opened a file, and referred to it as the "Freeman" incident.

71.      On May 21, 2008, in Argyle, Wisconsin, a 2007 Pontiac G5 traveled off the road
and struck a tree. Despite there being a frontal impact in this incident, the frontal airbags failed to
deploy.  The download of the SDM showed the key was in the "accessory/off" position. Old GM
received notice of this incident, opened a file, and referred to it as the "Wild" incident.

72.      On May 28, 2008, in Lufkin, Texas, a 2007 Chevrolet Cobalt traveled off the road
and struck a tree.  Despite there being a frontal impact in this incident, the frontal airbags failed to
deploy.   Old GM received notice of this incident, opened a file, and referred to it as the
"McDonald" incident.

73.      On September 13, 2008, in Lincoln Township, Michigan, a 2006 Chevrolet Cobalt
traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the
frontal airbags failed to deploy. Old GM received notice of this incident, opened a file, and referred
to it as the "Harding" incident.

74.      In 2008, in Rolling Hills Estates, California, a 2008 Chevrolet Cobalt traveled off
the road and hit a tree.  Despite there being a frontal impact in this incident, the frontal airbags
failed to deploy.  Old GM received notice of this incident, opened a file, and referred to it as the
"Dunn" incident.

75.      On December 2, 3008, in Lake Placid, Florida, a 2007 Chevrolet Cobalt traveled
off the road and hit a utility pole.  Despite there being a frontal impact in this incident, the frontal
airbags failed to deploy.  The download of the SDM showed the key was in the "accessory/off"
position.  Old GM received notice of this incident, opened a file, and referred to it as the
"Grondona" incident.

76.     In February 2009, Old GM opened yet another PRTS with respect to the Defective Vehicles — this time to investigate why the slot in the key in Cobalts allowed the key chain to hang too low in the vehicles, as well as the inadvertent shutting off of the vehicles.  Through this PRTS, Old GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of the ignition switch inadvertently turning off.

77.     In March 2009, Old GM approved of the design change in the key from the slot to a hole.  According to Old GM, this redesigned change was implemented in model year 2010 Chevrolet Cobalts.  Old GM, however, chose not to provide these redesigned keys to the owners or lessees of any of the vehicles implicated in the TSB, including the 2005 Cobalt.

78.     The following timeline gives a short overview of some key points between 2004 and the present, as discussed above:

| **2001-2004** | **2005-2009** | **2010-2014** |
|---|---|---|
| Old GM learns Key Systems are defective. | Old GM/New GM learn of Hundreds of field Reports of Key System failures and multiple fatalities. | New GM learns of more field reports of Key System Failures and additional fatalities. |
| **2005** | **2009** | **2014** |
| Old GM engineers' proposed fix Rejected; Amber Rose dies after airbag in Cobalt fails to deploy. | Old GM declares and emerges from bankruptcy. | New GM issues inadequate recall over 10 years after learning its Key Systems are defective. |

79.     Throughout this time period, Old GM, followed by New GM, were selling the Defective Vehicles to consumers for full price, and consumers were purchasing them believing that the vehicles were non-defective, but all the while Old GM and New GM were concealing the extent and nature of the defects in the Defective Vehicles.  As will be shown at trial, all the

foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**C.    Old GM's Marketing Represented to the Public that the Defective Vehicles Were Safe.**

80.    In a section called "safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

Your family's safety is important to us.  Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination.  That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

81.    Similarly, Old GM promoted its Saturn vehicle line on television with statements like "Putting people first," and "Saturn.  People First."  Saturn's print ad campaign featured advertisements like the following, which states, among other things: "Need is where you begin. In cars, it's about things like reliability, durability and, of course, safety.  That's where we started when developing our new line of cars."  In sum, in order to increase sales, Old GM touted the safety of its vehicles.  But, when the time came for the company to stay true to its words, Old GM did not disclose its knowledge about the dangerous Key System defects to its customers, including the Named Plaintiffs.

82.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern

25

District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*,
Case No. 09-50026 (REG).

**D.    Meet the New GM**

83.    In 2009, Old GM declared bankruptcy and, weeks later, it emerged from
bankruptcy. Both before and after Old GM's bankruptcy, the Key Systems in the Defective
Vehicles continued to fail and New GM, in all iterations, continued to conceal the truth.

84.    On May 15, 2009, New GM again met with Continental AG, an airbag component
supplier, and requested that Continental download SDM data from a 2006 Chevrolet Cobalt crash
where the airbags failed to deploy.

85.    On December 31, 2010, in Rutherford County, Tennessee, a 2006 Chevrolet Cobalt
traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the
frontal airbags failed to deploy. The download of the SDM showed the key was in the
"accessory/off" position. New GM received notice of this incident, opened a file, and referred to
it as the "Chansuthus" incident.

86.    On December 31, 2010, in Harlingen, Texas, a 2006 Chevrolet Cobalt traveled off
the road and struck a curb. Despite there being a frontal impact in this incident, the frontal airbags
failed to deploy. New GM received notice of this incident, opened a file, and referred to it as the
"Najera" incident.

87.    On March 22, 2011, Ryan Jahr, a New GM engineer, downloaded the SDM from a
Cobalt. The information from the SDM download showed that the key in that Cobalt turned from
the "run" to the "accessory/off" position 3 to 4 seconds before the crash.

88.    On December 18, 2011, in Parksville, South Carolina, a 2007 Chevrolet Cobalt
traveled off the road and struck a tree. Despite there being a frontal impact in this incident, the

frontal airbags failed to deploy.   The download of the SDM showed the key was in the "accessory/off" position.  New GM received notice of this incident, opened a file, and referred to it as the "Sullivan" incident.

89.    These incidents are not limited to vehicles of model year 2007 and before. According to New GM's own investigation, there have been over 250 crashes involving 2008-2010 GM vehicles in which the airbags failed to deploy.

90.    In 2010, New GM began a formal investigation of the frontal airbag non-deployment incidents in Chevrolet Cobalts and Pontiac G5s.  GM subsequently elevated the investigation to a Field Performance Evaluation ("FPE").

91.    In August 2011, New GM assigned Engineering Group Manager, Brian Stouffer as the Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

92.    In Spring 2012, Stouffer asked Jim Federico, a high-level executive and chief engineer at New GM, to oversee the FPE investigation.  Federico was the "executive champion" for the investigation to help coordinate resources for the FPE investigation.

93.    In May 2012, New GM engineers tested the torque on the ignition switches for 2005-2009 Cobalts, 2007 and 2009 Pontiac G5s, 2006-2009 HHRs, and 2003-2007 Saturn Ion vehicles in a junkyard.  The results of these tests showed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet Old or New GM's minimum torque specification requirements.  These results were reported to Stouffer and other members of the FPE.

94.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of the FPE investigation.  The Red X Team was a group of engineers within New GM assigned to find the root cause of the airbag non-deployments in frontal crashes involving GM vehicles.  By

that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal crashes was the defective Key System. The Red X Team became involved in the investigation shortly after Mr. Stouffer's request.

95.     During the field-performance-evaluation process, New GM determined that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem. Indeed, the New GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM rejected each of these ideas. New GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position. New GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem. New GM engineers also believed that the additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System. The New GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem, but New GM concealed — and continued to conceal — from the public the nature and extent of the defects.

96.     By 2012, Federico, Stouffer, and the remaining members of the Red X Team knew that the Key System in the Saturn Ion, the Cobalt, and the G5 vehicles had safety-related defects that would cause the key to move from the "run" to the "accessory/off" position while driving these vehicles. They also knew that when this happened the airbags would no longer work in frontal crashes. Federico, Stouffer, and the other members of the Red X Team also understood

that these safety-related defects had caused or contributed to numerous crashes and multiple fatalities.  Despite this knowledge, New GM chose to conceal this information from the pubic, NHTSA, and the Named Plaintiffs.

97.    In December 2012, in Pensacola, Florida, Ebram Handy, a New GM engineer, participated in an inspection of components from Brooke Melton's Cobalt, including the ignition switch.  At that inspection, Handy, along with Mark Hood, a mechanical engineer retained by the Meltons, conducted testing on the ignition switch from Brooke Melton's vehicle, as well as a replacement ignition-switch for the 2005 Cobalt.

98.    At that inspection, Handy observed that the results of the testing showed that the torque performance on the ignition switch from Brooke Melton's Cobalt was well below GM's minimum torque performance specifications.  Handy also observed that the torque performance on the replacement ignition switch was significantly higher than the torque performance on the ignition switch in Brooke Melton's Cobalt.

99.    In January 2013, Handy, in preparation for a Rule 30(b)(6) deposition, spoke with several GM engineers, including DeGiorgio and Stouffer.  At that time, Handy knew that, based on the testing he had observed, the original ignition switch in the 2005 Cobalt failed to meet GM's minimum torque performance specifications.  New GM knew that an ignition switch that did not meet its minimum torque performance requirements was a safety-related defect.

100.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**E.**    **GM Recalls Related to Ignition Switch Defects**

101.    On February 7, 2014, New GM, in a letter from Carmen Benavides, Director of Product Investigations and Safety Regulations for New GM, notified the NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.  In its February 7, 2014, letter to NHTSA, New GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

102.    In NHTSA Recall Campaign Number 14V047000, of February 10, 2014, affecting air bags and the electrical system, it was reported that the ignition switch "may turn off" of certain GM vehicles.  "This defect can affect the safe operation of the airbag system."  New GM advised that until the defect was repaired, "customers should remove all items from their key rings, leaving only the ignition key.  The key fob (if applicable) should also be removed from the key ring."  The recall campaign initially involved 619,122 model year 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles.  New GM later increased the recall to include an additional 748,024 model year 2006-07 Chevrolet HHR and Pontiac Solstice vehicles and 2003-2007 Saturn Ion vehicles and 2007 Saturn Sky vehicles.  Approximately a month later, New GM reported that defective ignition switches may have been used as service replacement parts on other vehicles, and again expanded the recall to include 2008-10 Chevrolet Cobalt, Saturn Sky, and Pontiac G5 and Solstice, as well as 2008-11 Chevrolet HHR vehicles.

103.    On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to the NHTSA.  The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.  The February 19, 2014 request for timeliness query also asked the NHTSA to investigate GM's failure to fulfill its legal obligation to

report the safety-related defects in the Defective Vehicles to the NHTSA within five days of discovering the defect.

104.    On February 24, 2014, New GM in a letter from Carmen Benavides, informed the NHTSA it was expanding the recall to include the 2006-2007 model year ("MY") Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.  GM included an Attachment to the February 24, 2014 letter.  In the Attachment, New GM **for the first time,** admitted that GM previously authorized a change in the ignition switch.  Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.  The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch.  This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch.  GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.  (GM's February 24, 2014 letter).

105.    New GM then produced documents in response to Congressional requests leading up to the hearings on April 1 and 2, 2014.  Among the documents produced by New GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006.  According to this document, Delphi had met all of the sign-off requirements in order to produce a new ignition switch for certain Old GM vehicles. New GM has acknowledged that the ignition switch in the Cobalt was included in this design change.  The design change included a new detent plunger "to increase torque force in the switch."  DeGiorgio's signature is on this page as the Old GM authorized engineer who signed off on this change to the ignition switch.  This Old GM Commodity Validation Sign-Off shows that DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013.  DeGiorgio perjured himself in order to fraudulently conceal evidence from the Plaintiffs that Old GM had signed off on the change in the ignition switch so

that the Plaintiffs, and ultimately a jury, would never know that Old GM was changing the switches in 2007 and later model year Cobalts and concealing these changes. DeGiorgio perjured himself when he signed the errata sheet confirming that all the testimony was true and accurate.

106. In June 2014, New GM recalled all 2010-14 Chevrolet Camaro vehicles manufactured December 3, 2008 to May 23, 2014 as part of NHTSA Campaign Number 14V346000. In those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine. If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

107. Also in June 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V355000 for defects that may cause the ignition switch to turn off. The 2005-09 Buick LaCrosse, 2006-11 Buick Lucerne, 2000-05 Cadillac DeVille, 2006-11 Cadillac DTS, 2006-14 Chevrolet Impala, and 2006-07 Chevrolet Monte Carlo vehicles were included. "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine." If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

108. In July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V400000 for defects that may cause the ignition switch to turn off. The 2000-05 Chevrolet Impala and Monte Carlo, 1997-03 Chevrolet Malibu, 2004-05 Malibu Classic, 1999-2004 Oldsmobile Alero, 1998-2002 Oldsmobile Intrigue, 1999-2005 Pontiac Grand Am, and

2004-08 Pontiac Grand Prix vehicles were included.  "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

109.    Also in July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V394000 for defects that may cause the ignition switch to turn off.  The 2003-14 Cadillac CTS vehicles manufactured August 16, 2001 to April 28, 2014, and 2004-06 Cadillac SRX vehicles manufactured March 20, 2003 to August 11, 2006 were included.  "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

110.    In September 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V540000.  The 2011-13 Chevrolet Caprice vehicles manufactured from October 15, 2010 to December 6, 2013 and 2008-2009 Pontiac G8 vehicles manufactured July 25, 2007, to February 18, 2009 were included.  In those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine.  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

111.   As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**F.    New GM Recalls Related to Other, Similar Life-Threatening Defects**

112.   New GM also recalled dozens of other models for similar, potentially life-threatening defects that caused sudden power or control loss to the Named Plaintiffs' vehicles, akin to the ignition switch recalls.

113.   In March 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V117000 for head impact and airbag defects.  The 2009-14 Chevrolet Express and GMC Savana vans were included.  As a result of airbag design defects, the vehicles "fail[ed] to meet the requirements of the Federal Motor Vehicle Safety Standard relating to Occupant Protection in Interior Impact."

114.   Also in March 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V118000 for side impact air bag wiring connection defects.  The 2008-13 Buick Enclave, 2009-13 Chevrolet Traverse, and 2008-10 Saturn Outlook vehicles were included. As a result of those defects, side impact airbags and seatbelt pre-tensioners may not deploy in the event of a crash.

115.   Also in March 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V153000 for sudden loss of electric power steering.  The 2004-06 and 2008-09 Chevrolet Malibu, 2004-06 Malibu Maxx, 2009-10 HHR (non-turbo), 2010 Cobalt, 2008-09 Saturn Aura, 2004-07 Saturn Ion, and 2005-09 Pontiac G6 were included.  "In the affected vehicles, there may be a sudden loss of electric power steering (EPS) assist that could occur at any

time while driving." "If power steering assist is lost, greater driver effort would be required to steer the vehicle . . . , increasing the risk of a crash."

116. In April 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V171000 for defects related to key removal when the ignition is not in the "off" position. The 2005-10 Chevrolet Cobalt, 2006-11 Chevrolet HHR, 2007-10 Pontiac G5, 2006-10 Pontiac Solstice, 2003-07 Saturn Ion, and the 2007-10 Saturn Sky vehicles were included. The removal of the key in the "on" position may cause the vehicle to roll away, which increases the risk for a crash and occupant or pedestrian injuries.

117. In May 2014, New GM recalled certain vehicles as part of Recall ID Number 103649 for electronic stability control defects. The 2004-12 Chevrolet Malibu vehicles manufactured May 16, 2003, through October 11, 2012, 2004-07 Malibu Maxx vehicles manufactured June 25, 2003, through April 5, 2007, 2005-10 Pontiac G6 vehicles manufactured May 26, 2004, through January 4, 2010, and 2007-10 Saturn Aura vehicles manufactured April 24, 2006, through May 26, 2009 were included. The defects can cause one or more of these conditions: the brake lights to illuminate without the brake pedal being pushed; the brake lights to not illuminate when the pedal is pushed; difficulty disengaging the cruise control; moving the gear shifter out of the "PARK" position without pushing the brake; and disablement of crash avoidance features such as traction control, electronic stability control, and panic braking assist features. Any of the foregoing increases the risk of a crash.

118. In June 2014, New GM recalled 2014 Chevrolet Corvette vehicles manufactured from November 30, 2013 to March 25, 2014 and equipped with optional sports seats as part of NHTSA Campaign Number 14V342000 for airbag defects. The model's seats did not meet

specifications for injury protection of an unbelted young child.  In the event of a crash necessitating side airbag deployment, and unbelted young child may be at an increased risk of neck injury.

119.    Also in June 2014, New GM recalled 2013-14 Chevrolet Cruze vehicles for driver's side airbag defects as part of NHTSA Campaign Number 14V372000.  In those vehicles, the driver's front airbag inflator may have been manufactured with an incorrect part.  In the event of a crash necessitating deployment of the driver's side airbag, the airbag's inflator may rupture and the airbag may not inflate.  The rupture could cause metal fragments to strike and potentially seriously injure the vehicle occupants.  Additionally, if the airbag does not inflate, the driver is at an increased risk of injury.

120.    In July 2014, New GM recalled 2014 Chevrolet Impala vehicles manufactured from November 5, 2012 to December 20, 2013 for loss of power steering assist as part of NHTSA Campaign Number 14V450000.  The affected vehicles may suffer from loss of power steering assist during start up or while driving.  If power steering is lost, greater driver effort would be required to steer the vehicle, increasing the risk of a crash.

121.    Also in July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V460000 for corrosion of brake module defects.  The 2009-10 Chevrolet Aveo and 2009 Pontiac G3 vehicles were included.  Those vehicles may contain brake fluid that does not protect against corrosion of the valves inside the anti-lock brake system ("ABS") module, affecting the closing motion of the valves.  If the ABS valve corrodes, it may result in longer brake pedal travel or reduced performance, increasing the risk of vehicle crash.

122.    In August 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V490000 for defects related to key removal when the ignition is not in the "off" position.  The 2002-04 Saturn Vue vehicles manufactured from September 11, 2001 to April 6,

2004 were included. The removal of the key in the "on" position may cause the vehicle to roll away, which increases the risk for a crash and occupant or pedestrian injuries.

123.    In September 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 12V460000 for defects related to automatic transmission shift cable detachment. The 2007-10 Saturn Aura, and the 2008-10 Chevrolet Malibu and Pontiac G6 vehicles equipped with a four-speed automatic transmission. If the transmission shift cable were to fracture and detach, the shift lever and actual transmission gear position may not match. The vehicle may not restart and may roll away after the driver exits the vehicle, resulting in a crash without prior warning.

124.    In October 2014, New GM recalled 2015 Cadillac Escalade and Escalade ESV vehicles as part of NHTSA Campaign Number 14V624000 for inconsistent passenger airbag deployment. The vehicles fail to comply with the requirements of Federal Motor Vehicle Safety Standard No. 208, "Occupant Crash Protection." Inconsistent airbag deployment increases the risk of personal injury in the event of a crash necessitating airbag deployment.

## G.    The Named Plaintiffs' Specific Experiences

125.    The Named Plaintiffs incorporate each and every paragraph above as if fully set forth herein. Each of the Named Plaintiffs listed in Exhibit A asserts a loss of vehicular control or other crash in a Defective Vehicle resulting in the death and/or serious personal injuries of the Plaintiffs listed in Exhibit A.

**VI.**
**CLAIMS AGAINST GENERAL MOTORS, LLC BROUGHT BY ALL**
**NAMED PLAINTIFFS LISTED IN EXHIBIT A**

**COUNT 1 - Negligence, Gross Negligence, Recklessness**

126.    The Named Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

127.    Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed product liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages. New GM also acquired knowledge of Old GM's activities and the defective ignition switch, and other serious defects, via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order.  Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM.  Further, as identified therein, certain Named Plaintiffs have claims for crashes involving Old GM vehicles that caused personal injury, loss of life or property damage and New GM is therefore liable to the Named Plaintiffs.

128.    Old GM and New GM owed Named Plaintiffs a duty to design, manufacturer, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as Named Plaintiffs.

129.    Old GM and New GM owed the Named Plaintiffs a duty to detect known safety defects in GM vehicles.

130.    Old GM and New GM owed the Named Plaintiffs a duty, once it discovered the ignition switch defect, to provide thorough notice of the defect, including a warning that the

defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

131.    Old GM and New GM owed the Named Plaintiffs a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

132.    Old GM and New GM knew that their customers, such as the Named Plaintiffs, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

133.    Old GM and New GM efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Named Plaintiffs and other drivers of GM vehicles.  Old GM and New GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, Old GM and New GM had a responsibility to the Named Plaintiffs and other drivers to take the reasonable measures listed above.

134.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damages, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Named Plaintiffs were among the product liability of Old GM assumed by New GM.

135.    Independent of any failures by Old GM as described herein, New GM breached its duties to the Named Plaintiffs by failing to provide appropriate notice of and repair procedures for the Named Plaintiffs' Defective Vehicles.  In doing so, New GM departed from the reasonable standard of care required of it.

136.    It was foreseeable that if the New GM did not provide appropriate notice and repair procedures for the Defective Vehicles, the Named Plaintiffs and other drivers would be endangered.

137.    The Named Plaintiffs injuries were reasonably foreseeable to Old GM and New GM.

138.    The Named Plaintiffs could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence and gross negligence.

139.    Old GM's and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

140.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**COUNT II - Fraud by Non Disclosure**

141.    The Named Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

142.    As early as 2001, during pre-production development of the Saturn Ion, Old GM became aware of issues relating to the ignition switch "passlock" system.  The 2001 report stated that the problem included a "low detent plunger force" in the ignition switch.

143.    In 2003, before the launch of the 2005 Cobalt, Old GM became aware of incidents wherein the vehicle engine would suddenly lose power in the event the key moved out of the "run"

position when the driver inadvertently contacted the key or steering column. An investigation was opened and, after consideration of lead-time required and the cost and effectiveness of potential solutions, the investigation was closed with no action taken.

144.    As set forth above, Old GM and New GM intentionally concealed or failed to disclose material facts related to the ignition switch defects from the Named Plaintiffs, the public, and NHTSA. In addition, Old GM and New GM failed to timely disclose the other serious and potentially life-threatening defects in the Defective Vehicles within such time and in such manner as to prevent the Named Plaintiffs injuries and/or deaths.

145.    Additionally, New GM possessed independent knowledge of the defects in the Named Plaintiffs' Defective Vehicles and the need to undertake multiple design steps to resolve those defects to prevent injury and economic harm to vehicle owners such as Plaintiffs. This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

146.    Old GM had a duty to disclose the facts to the Named Plaintiffs and Old GM knew: (1) that the Named Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Named Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed. Old GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the subject incidents of the Named Plaintiffs. Because New GM assumed product liability for crashes causing personal injury, loss of life or property damages, New GM is liable to the Named Plaintiffs.

147.    Specifically, under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed

41

product liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages. New GM also acquired knowledge of Old GM's activities and the defective ignition switch via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. Thus, the duties of Old GM are part of the foundation for the product liability assumed by New GM. Further, as identified therein, certain Named Plaintiffs have claims for crashes involving Old GM vehicles that caused personal injury, loss of life or property damage and New GM is therefore liable to these Plaintiffs.

148.    By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Named Plaintiffs were among the product liabilities of Old GM assumed by New GM. Independent of any failures by Old GM as described herein, New GM breached its duties to the Named Plaintiffs by failing to disclose knowledge of the defects in the Defective Vehicles to the Named Plaintiffs.

149.    New GM had a duty to disclose the facts to the Named Plaintiffs and New GM knew: (1) that the Named Plaintiffs were ignorant of the material facts that New GM did not disclose and/or intentionally concealed; and (2) the Named Plaintiffs did not have an equal opportunity to discover the material facts that New GM did not disclose and/or intentionally concealed.

150.    By failing to disclose these material facts, New GM intended to induce the Named Plaintiffs to take some action or refrain from acting.

151.     The Named Plaintiffs relied on New GM's non-disclosure and they were injured as a result of acting without knowledge of the undisclosed facts.

152.     As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**COUNT III - Strict Liability**

153.     The Named Plaintiffs re-allege as if fully set forth, each and every allegation set forth herein.

154.     Old GM and New GM, at all times relevant to this action, were engaged in the design, testing, manufacture, distribution, and sale of automobiles, including the Defective Vehicles.

155.     The Defective Vehicles were expected to and did reach users and consumers without substantial change in the condition in which it was sold.

156.     The Defective Vehicles were in a defective condition creating risk of harm to a user or a consumer, including Named Plaintiffs.

157.     The defects set forth herein caused the Named Plaintiffs' injuries.

158.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed product liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damage. As identified therein, certain Named Plaintiffs have claims for crashes involving Old GM vehicles

that caused personal injury, loss of life or property damages and New GM is therefore liable to these Plaintiffs.

159.   These injuries and losses were caused by New GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicles in a defective condition for which it is strictly liable to the Named Plaintiffs pursuant to Restatement (Second) of Torts § 402A.  Alternatively, the injuries and losses were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicles in a defective condition for which New GM is strictly liable to the Named Plaintiffs pursuant to Restatement (Second) of Torts § 402A because these product liabilities were assumed by New GM.

160.   These injuries were caused by New GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicles without proper and adequate warnings, instructions, and/or guidelines for safe use for which it is strictly liable to the plaintiffs.  Alternatively, these injuries were caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling and/or supplying the Defective Vehicles without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to the plaintiffs because these product liabilities were assumed by New GM.

161.   By reason of New GM's assumption of product liability under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement for crashes involving Old GM vehicles causing personal injury, loss of life or property damage, the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Named Plaintiffs were among the product liabilities of Old GM assumed by New GM.  Independent of any failures

44

by Old GM as described herein, New GM breached its duties owed to the Named Plaintiffs as described herein.

162.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

## VII.
## DAMAGES

163.    The Named Plaintiffs pray for damages against the Defendant in a sum of money in excess of the jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00) plus costs and any such other relief to be deemed just and equitable to which they are entitled.

## VIII.
## JURY DEMAND

164.    The Named Plaintiffs request a trial by jury.

## IX.
## PRAYER

For the foregoing reasons, Named Plaintiffs pray that the Defendant be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for each Plaintiff against Defendant for actual damages, as alleged, and exemplary damages, subject to proof and the limitations of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG); together with pre-judgment interested (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest

at the legal rate, costs of court; and such other and further relief to which Named Plaintiffs may be

entitled at law or in equity.

Dated:  October 27, 2017

**BAILEY PEAVY BAILEY COWAN
HECKAMAN PLLC**


By:   /s/  K. Camp Bailey
      K. Camp Bailey
      Texas Bar No. 24006782
      Laurence G. Tien
      Texas Bar No. 24003057
      Robert W. Cowan
      Texas Bar No. 24031976
      Justin C. Jenson
      Texas Bar No. 24071095
      Marathon Oil Tower
      5555 San Felipe, Suite 900
      Houston, Texas 77056
      Telephone:  713-425-7100
      Facsimile:  713-425-7101
      bailey-svc@bpblaw.com